# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 6, 2007 Session

## STATE OF TENNESSEE v. JAMES SCOTT

**Appeal from the Criminal Court for Shelby County**
**No. 05-03148     James C. Beasley, Judge**

---

### No. W2006-02519-CCA-R3-CD  - Filed April 7, 2008

---

A Shelby County Criminal Court jury convicted the defendant, James Scott of one count of driving under the influence of an intoxicant (DUI), fourth offense.  On appeal, he alleges that the trial court erred in denying his motion to dismiss the indictment for selective prosecution and his attempt to impeach a witness without viewing the pertinent parts of a video he claimed supported both claims, that the trial court erred in imposing more than the presumptive minimum sentence, and that the trial judge erred in failing to recuse himself for the ruling on the motion for new trial.  Upon review, we reverse the trial court's order overruling the motion for new trial and remand.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed, Remanded.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Paul Lewis, Millington, Tennessee, for the appellant, James Scott.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and James Wax and Kirby May, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

On May 10, 2005, the Shelby County Grand Jury indicted the defendant on one count of DUI, fourth offense, *see* T.C.A. § 55-10-401, and one count of reckless driving, *see id.,* § 55-10-205.

In the June 2006 trial, Shelby County deputy and 18-year police veteran Michael Reed testified for the state that he was on duty at Walnut Grove Road and Moore Road at about 2:30 a.m. on January 21, 2005.  Deputy Reed observed a Toyota Land Cruiser that he thought was traveling at an excessive rate of speed.  His rear and front radars both clocked the vehicle at 70 miles per hour

in a 55 miles per hour speed zone. Deputy Reed initiated a traffic stop for the speeding offense.

As Deputy Reed pulled up to stop behind the defendant's vehicle and advised the dispatcher he had initiated a traffic stop, the defendant got out of his car. "As [the defendant] got out of the vehicle, he appeared to have a unsteady gait to him, and – as I was, you know, getting out to make contact with him." Deputy Reed testified that while speaking with the defendant "I was already detecting, you know, an odor of intoxicant coming off of him, and you know, that along with his gait as he got out of the car and his eyes being bloodshot and watery was leading me to believe that he may be intoxicated at that point." Deputy Reed had the defendant sit in the squad car to wait for a DUI officer to come to the scene. He did not perform the field sobriety test alone because of "the area that we were in, you know, and the speed and the darkness I felt just me and him alone there was unsafe . . . until I had another vehicle there with me." During the wait, Deputy Reed noticed the defendant had slurred speech and "that the inside of my car was beginning to smell like alcohol now."

When the DUI officer arrived, he administered field sobriety tests while Deputy Reed observed. The defendant performed poorly on the field sobriety test, which was videotaped and shown to the jury. The officer read the Tennessee implied consent law to the defendant and asked that he submit to a breathalyzer test to determine blood alcohol content, and he refused. The defendant was subsequently placed in the back of Deputy Reed's patrol car. The defendant asked Deputy Reed to call his friend, Memphis Police Officer Dewayne Johnson, to get his vehicle from the scene. Deputy Reed called Officer Johnson, who arrived on the scene and spoke with the officer. Officer Johnson then spoke with the defendant through the patrol car window and left the scene.

Before cross examination of Deputy Reed, the defense revisited its previously denied pre-trial motion to dismiss the charges on the basis of selective prosecution and asked that the remainder of Deputy Reed's patrol car dashboard video tape be admitted into evidence. In addition to capturing the defendant's traffic stop and arrest, Deputy Reed's dashboard camera also videotaped several days of other traffic stops prior to the defendant's arrest. The defendant argued that three prior stops should be admitted for reasons of fairness under Tennessee Rule of Evidence 106 because other traffic stops on the tape show Deputy Reed's stopping female drivers for speeding, but treating them differently than the defendant. The judge found this argument irrelevant, saying "[p]rior stops either on that night or on days before or whenever they occurred have no bearing whatsoever on the observations and the probable cause for the purposes of arresting Mr. Scott on the night in question."

On cross examination, Deputy Reed testified that the defendant did not exhibit driving characteristics of an impaired person and that he was pulled over solely for speeding. The observation that the defendant was impaired came after the stop. Deputy Reed testified that the system of having another officer perform the field sobriety tests while he graded it was "the way it's always been done." Deputy Reed said he did not give preferential treatment to people based on who they knew, but sometimes he would not issue a ticket if someone worked for the county. He said that the defendant showed no signs of reckless driving and that the scent of alcohol was not necessarily a sign of impairment.

Deputy Mark Harker testified that he was called to the scene to administer field sobriety tests to the defendant at about three in the morning on January 21, 2005. He testified that the defendant "had a strong odor of alcohol on his breath. He had bloodshot eyes. He had slightly slurred speech, little bit unsteady on his feet, things of that nature." The defendant's performance on the field sobriety tests were "not very good at all." Deputy Harker testified he had seen over 50 impaired individuals in his work experience, and based on poor performance in the field sobriety tests, his opinion was that the defendant was intoxicated and should not have been driving.

On cross examination, Deputy Harker admitted that he never saw the defendant driving that morning, that bloodshot eyes alone cannot be used to determine intoxication, and that a field sobriety test cannot determine a person's blood alcohol level.

The defendant chose not to testify, but the defense called Memphis Police Officer Dewayne Johnson, who testified he showed up at the scene of the defendant's arrest on the evening of January 21, 2005, after getting a call from Deputy Reed. He has been a friend of the defendant's for three years. He spoke with the defendant for about five minutes while he was in the back of a patrol car and did not observe bloodshot eyes or a slurred voice. Officer Johnson testified that in his opinion the defendant was not under the influence of alcohol at the time of the arrest.

The charge of reckless driving was dismissed during the trial on motion of the State. The jury found the defendant guilty of DUI, fourth offense, a Class E Felony.

The first sentencing hearing was scheduled for July 10, 2006. On that date, the State offered no evidence other than a presentence report. The defendant offered no proof. The judge, James C. Beasley, stated that the defendant and the judge's daughter have a mutual friend who was apparently present in court during the trial. The friend mentioned this to his daughter when they met within the last week, and the daughter informed the judge, her father, of this. She also told Judge Beasley that she met the defendant within the last week at the Fox and Hound, a bar. Although Judge Beasley did not think it would bias his ability to hear the case, he wanted to state it for the record. The defense, however, moved for Judge Beasley's recusal, and Judge Beasley granted the request, commenting he would feel a little more comfortable if someone else did the sentencing.

The sentencing hearing was re-scheduled for July 28, 2006; however, the new judge, Joseph B. Dailey, postponed the sentencing an additional 30 days for the defendant to show proof he was taking steps to combat his problem with alcohol.

In the sentencing hearing held on August 28, 2006, the defendant stated that he left his job as a bartender to work in restaurant management and has been going to Alcoholics Anonymous program meetings five times a week. He has a sponsor and has been sober since July 24, 2006. The court pushed sentencing back 30 more days for the defendant to show his ability to attend 30 program meetings in 30 days.

The next hearing was held on September 29, 2006, by Judge Lee V. Coffee. The court applied the enhancement factor that the defendant had a history of criminal behavior. The defendant was sentenced to 18 months, to be served via 150 days' incarceration at 100%, followed by 13 months' probation. Additionally, the defendant was fined $3,000, his driver's license was revoked for five years, and he was ordered to attend alcohol rehabilitation and Mothers Against Drunk Driving lectures. Finally, the court ordered frequent random drug and alcohol screens during his probation period.

The original trial judge, James C. Beasley, heard the defendant's Motion for a New Trial on October 25, 2006, and overruled the motion. The defendant filed a timely notice of appeal on November 21, 2006. In this appeal, he alleges that the trial court erred in denying his motion to dismiss for selective prosecution and his attempt to impeach Officer Reed without viewing the pertinent parts of the video he wished to enter into evidence, that the trial court erred in sentencing him beyond the presumptive minimum sentence, and that the trial court judge erred in failing to recuse himself from the proceeding on the motion for new trial.

*I. The Denial of the Videotape Into Evidence*

The defendant first alleges that the trial court erred in denying his motion to dismiss the indictment based upon selective prosecution without first viewing the videotape evidence. At the heart of the claim is that the charges against the defendant were the result of the discriminatory practices of the officers.

Because practical realities dictate the allocation of limited public resources, our courts must afford public officials substantial discretion with regard to law enforcement decisions. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S. Ct. 663 (1978). The withholding of criminal sanctions in certain situations does not necessarily implicate the equal protection provision in our federal and state constitutions. *See State v. Martin*, 719 S.W.2d 522, 525 (Tenn. 1986). There is no constitutional right to have the law go unenforced against an offender. *Futernick v. Sumpter Twp.*, 78 F.3d 1051, 1056 (6th Cir. 1996).

Nevertheless, government officials do not have totally unfettered discretion to enforce our criminal laws; enforcement decisions may not be deliberately based upon unjustifiable standards such as race, religion, or other arbitrary classifications. *Wayte v. United States*, 470 U.S. 598, 608, 105 S. Ct. 1524, 1531 (1985). Persons claiming selective enforcement must establish that the law enforcement decision had a discriminatory purpose and produced a discriminatory effect. *United States v. Armstrong*, 517 U.S. 456, 465, 116 S. Ct. 1480, 1487 (1996). To be successful, a selective enforcement claimant must establish that: (1) the government has singled out the claimant for enforcement action while others engaging in similar activity have not been subject to the same action; and (2) the decision to prosecute rests on an impermissible consideration or purpose. *421 Corp. v. Metropolitan Gov't of Nashville & Davidson County*, 36 S.W.3d 469, 480 (Tenn. Ct. App. 2000). The first element requires proof that other non-prosecuted offenders engaged in similar conduct, that those offenders violated the same law the claimant is accused of violating, and that the

magnitude of their violation was not materially different from that of the claimant. *Id*. As to the second element, the claimant must establish that the government singled out a protected class of citizens for enforcement or that the prosecution was intended to deter or punish the exercise of a protected right. *Id*. at 481.

Our viewing of the videotape confirms that the facts in the case at hand do not show selective enforcement. The three other traffic stops on the tape do not show selective enforcement. The three stops were all for speeding, and none were for driving under the influence. After stopping the defendant for speeding, Officer Reed, a police officer with 18 years' experience, formed the opinion that the defendant was intoxicated. In the other stops cited in the defendant's brief, Officer Reed made no findings of impairment. These stops do not show others engaging in the same action as the defendant. Furthermore, one of the alleged instances of selective enforcement cited by the defendant resulted in the female driver being cited for speeding. In the other two traffic stops, the individuals who were not charged engaged in conduct different from that of the defendant. The two non-prosecuted traffic stops involved individuals who remained in their cars, behaved politely, and were not under the influence of alcohol. The same videotape shows that in the defendant's traffic stop, after being pulled over, the defendant immediately left his automobile to confront the officer, he had trouble maintaining his balance and speaking coherently while speaking to Officer Reed, and he cursed during the conversation.

The defendant also argues that the trial court erred in not permitting him to impeach Officer Reed's testimony by showing the jury the videotape of another, specific traffic stop. The defendant claimed the tape would contradict Officer Reed's testimony that he was able to detect impaired drivers. We agree with the trial court that such video evidence was irrelevant; the singular nature of a given traffic stop makes it difficult, if not impossible, to ascertain any pattern of behavior from just two stops. Irrelevant evidence is inadmissible. *See* Tenn. R. Evid. 402.

*II. Motion for New Trial*

The defendant claims that the denial of his motion to disqualify the trial judge was error. The primary ground for disqualification cited by the defendant was the social contact that occurred between the defendant and the trial judge's daughter after the defendant was convicted of DUI in the judge's courtroom. After the trial judge placed notice of the meeting on the record, the defense moved for his disqualification from sentencing. The judge agreed. However, when the defense again moved for his disqualification on the motion for new trial to avoid the appearance of impropriety, that motion was denied.

The issue of a trial judge's recusal based upon alleged bias or prejudice rests within the discretion of the trial court. *Caruthers v. State*, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991). A judge should grant a motion for recusal whenever his or her "impartiality might reasonably be questioned." Code of Judicial Conduct, Canon 3(E)(1); *see State v. McCary*, 119 S.W.3d 226, 260 (Tenn. Crim. App. 2003). This court will not interfere with the trial court's discretion unless clear abuse appears on the face of the record. *Owens v. State*, 13 S.W.3d 742, 757 (Tenn. Crim. App.

1999); *Caruthers*, 814 S.W.2d at 67.

Tennessee Supreme Court Rule 10, Canon 3(E)(1) provides that "[a] judge *shall* disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where [] the judge has a personal bias or prejudice concerning a party." Tenn. Sup. Ct. R. 10, Canon 3(E)(1)(a), (b) (emphasis added). In response to a disqualification motion, the judge should not only examine "subjective bias" but should also inquire whether the judge's impartiality might be reasonably questioned under an "objective standard." *State v. Connors*, 995 S.W.2d 146, 149 (Tenn. Crim. App. 1998). The latter standard "'takes into account that disqualification is required if there is an appearance of partiality to the reasonable observer, and it precludes a judge from avoiding recusal merely by avowing his or her impartiality.'" *State v. Conway*, 77 S.W.3d 213, 225 (Tenn. Crim. App. 2001) (quoting *Connors*, 995 S.W.2d at 149).

No Tennessee law directly addresses whether judges may recuse themselves with respect to some issues while yet deciding others in the same case. Two federal circuit courts have rejected this concept of partial recusal. *See United States v. Feldman*, 983 F.2d 144, 145 (9th Cir. 1992) ("When a judge determines that recusal is appropriate it is not within his discretion to recuse by subject matter or only as to certain issues and not others."); *Murray v. Scott*, 253 F.3d 1308, 1311 (11th Cir. 2001) (stating that a judge's recusal must be from whole proceeding). However, three circuits support the use of partial recusal as a case-management device. *See Ellis v. United States*, 313 F.3d 636, 641-42 (1st Cir. 2002); *Pashaian v. Eccelston Props.*, 88 F.3d 77, 84-85 (2d Cir. 1996); *United States v. Kimberlin*, 781 F.2d 1247, 1258-59 (7th Cir. 1985).

In the instant case, Judge Beasley recused himself after stating, "[F]rankly, based upon where my daughter ran into Mr. Scott and under the circumstances. . . I think I would feel a little more comfortable if somebody else did the sentencing." Apparently, the trial judge believed that the issue could at least create an impression of partiality. We agree and conclude that the earlier recusal was appropriate, if not required. Because the record does not evince any change in circumstances between the sentencing hearing and the hearing on the motion for new trial, at least an appearance of impropriety remained. Neither Judge Beasley's statement at the hearing on the motion for new trial that he did not recall the conversation nor his conclusion that a motion for new trial is simply a technical ruling alters the appearance of impropriety.

Judge Beasley should have remained disqualified from the case regardless of whether partial recusal is proper under Tennessee law. If Tennessee does not allow partial recusal, the recusal of a judge from a case disqualifies him or her from taking further action in the case, *including the action of resuming control of the case*. If Tennessee does, in fact, allow partial recusal, Judge Beasley's return would remain improper because the appearance of impropriety remained. In either case, Judge Beasley abused his discretion by declining to recuse himself from the hearing on the motion for new trial.

-6-

Turning to remedy, the defendant has not requested any specific remedy and we discern none other than a remand to the trial court for a rehearing on the motion for new trial by a different judge.

### III. Issues of Sentencing

The defendant next argues that the sentence of 18 months with 150 days' incarceration is excessive. He alleges that the conviction of a Class E Felony entitled him to the presumptive minimum sentence of one year with 150 days to be served.[1]

The defendant was convicted as a Range I, standard offender, and according to the record, the trial court followed the correct procedures and considered the appropriate sentencing principles, facts, and circumstances.

> [T]he fourth or subsequent conviction [for DUI] shall be a Class E felony punishable by a fine of not less than three thousand dollars ($3,000) nor more than fifteen thousand dollars ($15,000) [and] by confinement for not less than one hundred fifty (150) consecutive days, nor more than the maximum punishment authorized for the appropriate range of a Class E felony.

T.C.A. § 55-10-403(a)(1)(A) (2004). A Class E Felony in Range I is punishable by a confinement term of not less than one nor more than two years. T.C.A. § 40-35-112(a)(5) (2003). As applicable to this case, the presumptive sentence to be imposed by the trial court for the Appellant's Class E felony conviction is the minimum sentence within the applicable range unless there are enhancement or mitigating factors present.

When a defendant challenges the sentencing decision of the trial court, this court generally conducts a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2003). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the defendant. *Id.* If the review

---

[1] At the time of the defendant's sentencing, the legislature had amended the sentencing code to address the implications of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). *See* T.C.A. § 40-35-114 (2003) (promulgating factors for enhancing sentence length) (amended Pub. Acts 2005, ch. 353, § 5 (effective June 7, 2005)). Among other more substantive changes, the 2005 amendment to section 40-35-114 entailed a change in the numbering for the enhancement factors listed in the 2003 bound volume of Tennessee Code Annotated. The numbering of factors used in this opinion is the numbering used by the trial court, being the numbering that appeared in the pre-2005 version of section 40-35-114. Having committed the offenses under review on January 21, 2005, the defendant was not subject to sentencing via the 2005 amendments to the sentencing code unless he "execut[ed] a waiver of [his] ex post facto protections." T.C.A. § 40-35-114 (Supp. 2005), compiler's notes. The record in the present case reflects no such waiver. Thus, the sentencing was governed by the pre-2005 sentencing provisions.

reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence "even if we would have preferred a different result." *State v. Fletcher,* 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby,* 823 S.W.2d at 169.

In making its sentencing determination in the present case, the trial court, at the conclusion of the sentencing hearing, was obliged to determine the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the guilty plea and sentencing hearings, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant made in his behalf about sentencing, and (7) the potential for rehabilitation or treatment. T.C.A. § 40-35-210(a), (b); -103(5) (2003); *State v. Holland,* 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

The use of enhancement factor (2) - that the defendant had a "previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range" - is supported in the record, which reveals prior arrests for public intoxication and the defendant's admission of sustained alcohol abuse. *See* T.C.A. § 40-35-114(2). We see no state-law basis for modifying any sentence imposed by the trial court.

Now, we address the *Blakely* issue. *See Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004).

On June 24, 2004, the United States Supreme Court released its opinion in *Blakely*, holding that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Id.* at 301, 124 S. Ct. at 2536 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000)). The "statutory maximum" to which a trial court may sentence a defendant is not the maximum sentence after application of appropriate enhancement factors, other than the fact of a prior conviction, but the "maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 303, 124 S. Ct. at 2537. Under *Blakely*, then, the "statutory maximum" sentence which may be imposed is the presumptive sentence applicable to the offense. *See id.*, 124 S. Ct. at 2537. The presumptive sentence may be exceeded without the participation of a jury only when the defendant has a prior conviction and/or when an otherwise applicable enhancement factor was reflected in the jury's verdict or was admitted by the defendant.

On January 22, 2007, the United States Supreme Court released its decision in *Cunningham v. California*, 549 U.S. ___, 127 S. Ct. 856 (2007), holding that California's sentencing scheme, which had numerous similarities to Tennessee's sentencing scheme, did not survive Sixth Amendment scrutiny intact under *Blakely*. Prior to the ruling in *Cunningham*, the Tennessee

Supreme Court had held that a judge's enhanced sentence pursuant to Tennessee's pre-2005 sentencing regime did not amount to plain error under *Blakely*. *See State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005) (*Gomez I*); however, following on the heels of *Cunningham*, on February 20, 2007, the United States Supreme Court vacated *Gomez I* and remanded that case for reconsideration in light of *Cunningham*, *see Gomez v. Tennessee*, 127 S. Ct. 1209 (2007).

On remand in *Gomez*, the Tennessee Supreme Court applied the principles of *Blakely* and *Cunningham* to determine that Tennessee's pre-2005 sentencing code violated Gomez' right to a jury trial. *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007) (*Gomez II*). The *Gomez II* court held that the trial court had committed plain error on constitutional grounds in applying factors for being a leader in the commission of the offenses and in possessing or employing a firearm to enhance sentences. *Id.*, at 741. In further conducting its plain error analysis, *see State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (approving a plain error regimen that includes a determination whether plain error review is necessary to do substantial justice), the supreme court held that the fulfillment of substantial justice required a "remand to the trial court for a *resentencing hearing* at which the trial court will have an opportunity to determine the full scope of the Defendants' criminal histories and to consider whether imposition of the maximum sentence on all convictions is appropriate." *Gomez II*, 233 S.W.3d at 743 (emphasis added). As part of the rigors of determining whether to notice plain error and, in particular, whether the mandate for substantial justice required the notice, the supreme court indicated its inability to fathom the trial court's weighing of the prior-conviction factor *vis a vis* the *Blakely*-infirm factors because the "record in this case as to the Defendants' criminal histories is not sufficiently well-developed for us to determine the proper sentences based on this enhancement factor alone." *Id*.

When increasing the defendant's sentence beyond the minimum, the judge at the sentencing hearing used enhancement factor 2 - "the defendant's history of criminal convictions or criminal behavior in addition to those needed to establish the appropriate range." T.C.A. § 40-35-114(2). However, the use of this factor was based upon the defendant's behavior that did not result in *convictions*. The court cited only public intoxication arrests and statements that the defendant continued to drink until the week before his first sentencing hearing.

Because the court applied an enhancement factor which violated the defendant's Sixth Amendment rights as defined by *Apprendi* and *Blakely*, we hold as a matter of plain error, *see* Tenn. R. Crim. P. 52(b), that the sentence enhancement violated the Sixth Amendment. We therefore modify the sentence to one year.

_____
JAMES CURWOOD WITT, JR., JUDGE

-9-